YEAGER *v.* POWELL.

4-9617                                    244 S. W. 2d 141

Opinion delivered December 17, 1951.

*Gaughan, McClellan & Gaughan,* for appellant.

*Guy B. Reeves* and *Royce Weisenberger,* for appellee.

GRIFFIN SMITH, Chief Justice.    The appeal is from a decree that certain corporation assets should be subjected to the payment of debts pro rata in contradistinction from pleas by the lenders of money that their mortgage on certain property created a priority.

Until a receiver was appointed in the cases presently to be discussed, L. Earl Powell, Jr., conducted an automobile agency at Hope. He also maintained a shop for repairs and kept a supplies department. Although incorporated in 1948 with a minimum of three shareholders, the business was—with but few exceptions—treated by Powell as though he personally owned it. Of an authorized 500 shares of stock 101 were issued. Powell took 99 shares, his wife received one, and a third certificate went to a non-active owner who does not feature in the litigation.

In August, 1949, W. W. Yeager and his wife, Mary B., loaned Powell $5,500, payable October 15th of that year with interest at ten percent from maturity. To secure the debt Powell executed a mortgage pledging "the entire parts stock and accessories of the Powell Nash Motors." The mortgage, written by Mrs. Yeager, was not filed in Hempstead county until February 24, 1950—nearly four months after due date of the note; and then it was not recorded. Other than mention of Powell Nash Motors there was nothing to indicate that either the note or the mortgage was a corporation obligation. Prior to September, 1948, the business had been a partnership and was operated under the same name.

On March 15, 1950, the Yeagers sued Powell and the corporation, charging that none of the principal or interest had been paid. They alleged that the money advanced was for use of the business headed by Powell. There was an averment that the nature of the mortgaged property was such that it might easily be lost, destroyed, or stolen, hence the plaintiffs petitioned that a receiver be appointed to take charge of the parts and accessories. Office equipment, shop machinery, and other things of value not included in the mortgage were in the same building with the parts and accessories, and the mortgagees no doubt felt that without a receiver their interests would be insecure.

Although the foreclosure complaint and petition for a receiver were filed in Hempstead Chancery Court during vacation, Powell immediately accompanied W. W.

Yeager to Prescott in Nevada county, entered his appearance, consented that a judgment on the note should be rendered, with decree of foreclosure, and understood that Talbot Field, Jr., had been appointed receiver.

It is admitted that before the August loan of $5,500 was made, Powell had borrowed $1,000 from the Yeagers and had executed a mortgage on a 1948 Nash wrecker as security. The mortgage was not filed of record when the transaction occurred, but it had been paid in full with interest when the larger loan became an issue; and yet, in spite of the fact that it had been satisfied, the Yeagers caused it to be filed Feb. 24, 1950.

On March 7—eight days before Powell confessed judgment in a neighboring county—General Contract Purchase Corporation had sued the corporation and its bondsman for $37,000. This circuit court action had been pending but five days when Greening Insurance Agency brought suit on an account, as did several others. Before going to Prescott Powell had conferred with Field to ascertain if he would accept the receivership.

. On March 22 Field was appointed receiver for beneficiaries under mortgages covering shop equipment, and later he was designated as general receiver for the entire business. March 31 Powell and his father intervened, claiming back salaries, and later there were interventions in favor of the State, acting through its Commissioner of Revenues, and in favor of the public acting through the collector of taxes for Hempstead county.

The Chancellor found (a) that automobile parts as they were dealt with by the corporation were merchandise falling within the classification covered by the Bulk Sales Law, requiring notice to creditors; (b) that without authority from the corporation's board of directors Powell, as president, was without authority to mortgage the parts; (c) that Powell and the corporation were insolvent when the mortgage was filed and probably so when it was made, and that these claimants were like common creditors.

Since appellants' only contention in the appeal is that the court erred in not directing full payment of their note, with interest, collateral matters will not be discussed except to the extent that they may serve to clarify the main issue.

*First.—Circumstances Attending Execution of the Mortgage.*—The third stockholder who held one share is shown by the charter to have been acting as trustee for an unrevealed person. Powell testified that the issue to this party was merely a qualifying interest. On direct examination Powell was asked by his attorney what inducements were made to the Yeagers when the loan was procured. Exact phraseology of the question was: "Did you, Mr. Powell, represent to Mr. and Mrs. Yeager that you had authority to mortgage *this property of the corporation?*" A. "Yes, sir."

W. W. Yeager had testified that he did not know that Powell Nash Motors was a corporation. On this phase of the examination he was carefully interrogated by the Court, and all of his answers were that he had no such information, did not regard it as of any importance, and merely expected the money to go into the business. Mrs. Yeager was not certain. She thought "maybe she knew something about it," and she asked Powell (when the mortgage was being prepared) if it wouldn't be better to have it executed by Powell Nash Motors. Powell explained that he had authority to do everything the company could do, and it didn't make any difference how the obligation read.

The form used was not the kind employed by corporations, nor was the acknowledgment anything but the assent, at least *prima facie,* of Powell—that is, his personal act. In *Fidelity & Deposit Company of Maryland* v. *Rieff,* 181 Ark. 798, 27 S. W. 2d 1008, an acknowledgment not reciting authority of the president and secretary of a corporation was upheld, but on the ground that the corporation seal was evidence, *prima facie,* that the officers were not acting in excess of their power. Judge Hart's comment was that an examination of the certifi-

cate of acknowledgment showed that the mortgage was executed by a corporation.

No satisfactory reason was given by Yeager for causing the paid mortgage securing $1,000 to be filed at the time the larger obligation was handed to the circuit clerk. Appellees intimate that its payment was effectuated through consolidation with the item of $5,500, but proof is lacking. Proceeds of the August note, said Powell, were turned over to him in the form of a check for $2,500 and $3,000 in cash. He testified that $5,000 was deposited in his bank the following day.

*Second.—Bulk Sales Law.*—Members of this court are not in agreement regarding effect of the note and mortgage—that is, whether the transactions were personal obligations of Powell, or whether the corporation was bound; but this is not important in view of a controlling view that the Bulk Sales Law was applicable, Ark. Stats., § 68-1501. The statute forbids mortgaging in bulk of any part or the whole of a stock of merchandise unless the mortgagor shall make a detailed inventory and supply the mortgagee with a list of creditors. It is the duty of the mortgagee to give notice for ten days, as set out in the Act, either personally or by registered mail.

It is argued that the ten-day period referred to runs from the time the mortgagee takes possession and that in the case at bar the receiver took charge of the parts and supplies.

It is in evidence through Powell's testimony that he was solvent when the $5,500 mortgage was executed; also that only five per cent of parts sold from the general stock went out across the counter. The remainder, said Powell, entered his own repair shop. It appears, however, that more non-Nash parts and supplies were carried than parts manufactured by Nash. A number of witnesses testified regarding the extent of purchases independently made. We think the evidence preponderates in favor of the conclusion that these parts and supplies were merchandise within the meaning of the Bulk Sales Law, and that failure to make and preserve an inventory and to

secure a list of creditors as the Act contemplates brought the transaction within the statute.

On the question of insolvency, and when it occurred, the testimony took a wide range. Our conclusion is that the Chancellor was justified in believing that on any fair appraisement neither Powell nor the corporation could have paid his or its debts when the mortgage was executed. The agency's affairs—whether examined from a personal or a corporation point of view—grew progressively worse, hence the mortgage if valid would be preferential in circumstances where other creditors did not have an opportunity to challenge it.

*Third.—The Court's Power to Invalidate the Mortgage.*—Appellant's final contention is that the court, at a term subsequent to that at which the foreclosure decree was rendered, was without power to set the judgment aside, therefore appellant's demurrer to the interventions ought to have been sustained. The weakness of this argument lies in the fact that when the receiver was appointed and when orders were made from time to time, the proceedings were continuing court actions.

Affirmed.

Mr. Justice GEORGE ROSE SMITH concurs.